******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE DENZEL W. ET AL.*
## (AC 46612)

Suarez, Westbrook and Harper, Js.

*Syllabus*

The respondent mother appealed to this court from the judgments of the
trial court terminating her parental rights with respect to her minor
children. The court concluded that the mother had failed to achieve
such degree of personal rehabilitation as would encourage the belief
that, within a reasonable time considering the ages and needs of the
children, she could assume a responsible position in their lives. The
mother began a relationship with the father of the children, T, in 2009,
and reported that domestic violence had occurred throughout the rela-
tionship and included both mental and physical abuse. The children had
been exposed to their parents' intimate partner violence, including a
stabbing incident in which T stabbed the mother in the face, neck and
chest. Following the stabbing, T was arrested, and a full no contact
protective order was put in place with the mother as the protected
party. Although the protective order continued to be in effect, the mother
and T still had contact with each other, including over the phone while
T was incarcerated and while in the mother's motor vehicle, which,
following a traffic stop, resulted in the arrest of both the mother and
T. The mother was also observed by family members with T in the
community. The mother denied that she had had any contact with T
since his release from prison. Following the removal of the children
from the mother's care, the mother was provided with weekly visits.
During the visits, the mother struggled with the use of electronics and
the children's behavioral needs, including allowing one child to play a
violent video game on her cell phone. The Department of Children and
Families referred the mother to a variety of services, and, although she
initially struggled with attendance, the mother did make some progress

* In accordance with the spirit and intent of General Statutes § 46b-142
(b) and Practice Book § 79a-12, the names of the parties involved in this
appeal are not disclosed. The records and papers of this case shall be open
for inspection only to persons having a proper interest therein and upon
order of the court.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3)
(2018), as amended by the Violence Against Women Act Reauthorization
Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to
identify any person protected or sought to be protected under a protection
order, protective order, or a restraining order that was issued or applied
for, or others through whom that party's identity may be ascertained.

and appeared engaged in the sessions she attended. There were continued concerns, however, regarding the mother's missed sessions, her inconsistency, and her difficulty in managing her work schedule and the children's appointments. A licensed clinical psychologist, P, conducted certain evaluations and explained that, although the mother had a general understanding of child development and expectations for independence, she had limitations regarding her ability to understand the children's emotional and psychological needs, as demonstrated by her allowing one child to play the violent video game that depicted violence and blood from the use of a knife. P opined that the mother failed to recognize the instability in her romantic relationship that led to the instability in the home for her children and that this lack of insight would be detrimental to the children being in her care. P further opined that the mother minimized how the intimate personal violence minimized her strength as a parent, she failed to understand how T's actions could place her children at risk, and she continued to struggle to understand how their cycle of violence over the years of their relationship created a chaotic and hostile environment that was unsafe for her children. The court concluded, by clear and convincing evidence, that the termination of the mother's parental rights was in the children's best interests and rendered judgments terminating her parental rights and appointing the petitioner, the Commissioner of Children and Families, as the children's statutory parent for the purpose of securing their adoption as expeditiously as possible. *Held*:

1. The respondent mother could not prevail on her claim that the trial court improperly shifted the burden of proof on the issue of personal rehabilitation to her: although the mother referenced as evidence one statement in the court's memorandum of decision, namely, that she "has not demonstrated that she is able to provide her children with a safe, secure, and permanent home free from intimate personal violence at the present time nor in the foreseeable future," this court concluded, upon reviewing the memorandum of decision as a whole, that the trial court did not shift the burden of proving personal rehabilitation to the mother and was aware of and applied the proper burden of proof that required the petitioner to prove, by clear and convincing evidence, that the mother had failed to achieve a sufficient degree of personal rehabilitation, as the court expressly stated that it had considered carefully, inter alia, the criteria set forth in the General Statutes and the applicable case law in granting the petitions to terminate parental rights on the basis of the clear and convincing evidence; moreover, the petitioner offered testimony from department social workers, a psychologist, and police officers regarding the instances of intimate personal violence, the mother's efforts to continue and conceal her relationship with T, even after he had stabbed her, her inability to maintain control and meet the emotional needs of the children during visits, and her failure to comply with requests to not bring her cell phone and allow her child

to play inappropriate video games during visits, and, on the basis of the evidence presented by the petitioner, the court concluded that she had met her burden with respect to the issue of failure to rehabilitate; furthermore, the isolated use of the imprecise language that formed the basis for the mother's claim reflected the court's rejection of the mother's evidence of personal rehabilitation only after it had determined that the petitioner had met her burden.

2. The respondent mother could not prevail on her claim that the trial court improperly determined that she had failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable period of time and considering the ages and needs of the children, she could assume a responsible position in the children's lives: there was sufficient evidence existing in the record to support the court's determination that the mother failed to rehabilitate as her continuing efforts to maintain her relationship with T despite the significant history of intimate partner violence, coupled with her efforts to conceal this relationship from the department, her providers, and the police, supported the court's conclusion that she had failed to address these issues, which placed the children at risk of trauma, and that she would continue to do so in the future; moreover, contrary to the mother's argument, the evidence reflected that the domestic violence issues had existed consistently throughout the relationship, and that the mother had continued to prioritize and maintain her relationship with T despite its negative effects on the children and the existence of a protective order.

Argued November 16, 2023—officially released May 9, 2024**

*Procedural History*

Petitions to terminate the respondents' parental rights with respect to their minor children, brought to the Superior Court in the judicial district of Middlesex, Child Protection Session at Middletown, and tried to the court, *Burgdorff, J.*; judgments terminating the respondents' parental rights, from which the respondent mother appealed to this court. *Affirmed.*

*Matthew C. Eagan*, assigned counsel, for the appellant (respondent mother).

*Nisa Khan*, assistant attorney general, with whom, were *Abhishek Mukund*, assistant attorney general,

---

** May 9, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

and, on the brief, *William Tong*, attorney general, for
the appellee (petitioner).

*Opinion*

HARPER, J. The respondent mother, Stephanie B.,
appeals from the judgments of the trial court, rendered
in favor of the petitioner, the Commissioner of Children
and Families, terminating her parental rights with
respect to her minor children, Denzel W. and Ariel W.[1]
On appeal, the respondent claims that the court improp-
erly (1) shifted the burden of proof on the issue of
personal rehabilitation to her and (2) determined that
she failed to achieve such degree of personal rehabilita-
tion as would encourage the belief that, within a reason-
able period of time and considering the ages and needs
of the children, she could assume a responsible position
in the children's lives. See General Statutes § 17a-112
(j) (3) (B). We affirm the judgments of the trial court.[2]

The following facts and procedural history are rele-
vant to our consideration of the respondent's appeal.
The Department of Children and Families (department)
became involved with the family at issue, which is com-
prised of the respondent, the father Timothy W., and
their four children, in 2012.[3] This involvement includes
fourteen referrals to the department's Careline[4] regard-
ing physical neglect of the children, an inability to meet

---

[1] The court also terminated the parental rights of the respondent father,
Timothy W., with respect to Denzel and Ariel. In addition to finding that he
had failed to rehabilitate, the court also determined that the petitioner
had proved abandonment as an additional ground to terminate Timothy's
parental rights as to the two children. Because Timothy is not participating
in this appeal, we refer in this opinion to Stephanie as the respondent.

[2] The attorney for the minor children has filed a statement adopting the
appellate brief of the petitioner. See Practice Book § 79a-6 (c).

[3] In addition to Denzel and Ariel, the respondent and Timothy also have
two other children together, both of whom previously were adjudicated
neglected.

[4] "Careline is a department telephone service that mandatory reporters
and others may call to report suspected child abuse or neglect." (Internal
quotation marks omitted.) *In re Anthony S.*, 218 Conn. App. 127, 136 n.9,
290 A.3d 901 (2023).

the basic needs of the children for supervision, the children's exposure to intimate partner violence between the respondent and Timothy, and their exposure to substance abuse by Timothy.[5]

On November 2, 2019, an incident of domestic violence occurred between the respondent and Timothy, forming the basis for the department's most recent involvement with the family. "[The respondent] reported that she has been stabbed by [Timothy] during an argument while the children were present inside the home. She sustained stab wounds to the face, neck, and chest area. While the knife was imbedded in her chest, [the respondent] checked on the children and she followed [Timothy] outside at which time [Timothy] pulled the knife out of her. [The respondent] called the police to report the assault and then called the paternal grandmother to come and care for the children. The children reported hearing [the respondent and Timothy] arguing but did not witness the assault. In her signed statement to the police, [the respondent] reported that [Timothy] had a knife and was threatening her, and that he intentionally stabbed her with the knife. [The department] was contacted by the police . . . [and the children were removed] from the home. [Timothy] was arrested . . . and a full no contact protective order was put in place with [the respondent] as the protected party. The protective order remains in place and does not have an expiration date."

The petitioner filed neglect petitions as to all four children on November 6, 2019, alleging that they were

[5] In its memorandum of decision, the trial court noted that, on November 6, 2019, ex parte orders of temporary custody were filed with respect to the parties' other two children, and the orders were sustained on November 19, 2019. On July 8, 2021, the court approved the permanency plans for a transfer of guardianship as to the parties' other two children, and, approximately one month later, it granted the motion to transfer guardianship to their maternal grandmother under six months of protective supervision, which later was allowed to expire on February 19, 2022. These two children are not the subject of this appeal.

denied proper care and attention and were permitted to live under conditions, circumstances and/or associations injurious to their well-being. On that same date, the petitioner also filed ex parte orders of temporary custody. Ten days later, the court, *Sanchez-Figueroa, J.*, issued ex parte orders vesting temporary custody of the children in the petitioner and ordered specific steps for both the respondent and Timothy.[6] Following

---

[6] The respondent's specific steps included the following: "[K]eep all appointments set by or with [the department]; cooperate with [the department's] home visits, announced or unannounced, and visits by the children's court-appointed attorney and/or guardian ad litem; let [the department], your attorney, and the attorney for the children know where you and the children are at all times; take part in counseling and make progress toward the identified treatment goals as to individual and family with the specific goals creating and maintaining safe, stable, and nurturing home environment free from domestic violence/criminal activity; address trauma history and understand the impact on present functioning; understand the impact of domestic violence on children; understand the danger that individuals present to children and how to protect children from future abuse; identify your own specific risk factors and develop a personalized plan for preventing abuse in the future; do not get involved with the criminal justice system and understand the current protective orders value and purpose; cooperate with service providers recommended for parenting/individual/family counseling, in-home support services and/or substance abuse assessment/treatment: New Horizons, IPV Fair; accept in-home support services referred by [the department] and cooperate with them; cooperate with service providers recommended for parenting/individual/family counseling, cooperate with court-ordered evaluations or testing; sign releases allowing [the department] to communicate with service providers to check on your attendance, cooperation and progress towards identified goals, and for use in future proceedings in this court. Sign the release within 30 days; sign releases allowing your children's attorney and guardian ad litem to review your children's medical, psychological, psychiatric and/or educational records; get and/or maintain housing and a legal income; immediately let [the department] know about any change in the makeup of the household to make sure the change does not hurt the health and safety of the children; get and/or cooperate with restraining/protective order and/or other appropriate safety plan approved by [the department] to avoid more domestic violence incidents; attend and complete an appropriate domestic violence program; not get involved with the criminal justice system. Cooperate with the Office of Adult Probation or parole officer and follow your conditions of probation or parole; take care of the children's physical, educational, medical, or emotional needs, including keeping the children's appointments with their medical, psychological, psychiatric, or educational providers; cooperate with the children's therapy; make all necessary childcare arrangements to make sure the children are properly supervised and cared for by the appropriate caretakers; keep the children in the State of Connecticut while the case is going on

a hearing, the court sustained the orders of temporary custody on November 19, 2019.

Petitions to terminate the parental rights of the respondent and Timothy as to Denzel and Ariel were filed on September 9, 2021.[7] As to the respondent, the petitions alleged that, pursuant to § 17a-112 (j) (3) (B) (i), the two children previously had been adjudicated neglected and the respondent had failed to achieve such degree of personal rehabilitation that would encourage the belief that, within a reasonable period of time, given the ages and needs of these two children, the respondent could assume a responsible position in their lives.

A termination of parental rights trial was held on February 21, 23 and 27, 2023. The court, *Burgdorff, J.*, heard testimony from seven witnesses, including two department social workers, the respondent's therapist, three members of law enforcement, and a court-appointed psychologist. On April 19, 2023, the court issued a comprehensive memorandum of decision in which it terminated the parental rights of the respondent and Timothy as to Denzel and Ariel. After setting forth the procedural history and making the relevant jurisdictional findings, the court initially observed that it "has carefully considered the petitions, the criteria set forth in the relevant Connecticut General Statutes,

unless you get permission from the [department] or the court to take them out of state. You must get permission first. Visit the children as often as [the department] permits; tell [the department] the names and addresses of the grandparents of the children."

[7] "Proceedings to terminate parental rights are governed by § 17a-112. . . . The [petitioner] . . . in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds. . . . Subdivision (3) of § 17a-112 (j) carefully sets out . . . [the] situations that, in the judgment of the legislature, constitute countervailing interests sufficiently powerful to justify the termination of parental rights in the absence of consent. . . . Because a respondent's fundamental right to parent his or her child is at stake, [t]he statutory criteria must be strictly complied with before termination can be accomplished and adoption proceedings begun." (Internal quotation marks omitted.) *In re Ryder M.*, 211 Conn. App. 793, 806–807, 274 A.3d 218, cert. denied, 343 Conn. 931, 276 A.3d 433 (2022).

the applicable case law as well as all of the evidence and testimony presented, the demeanor of [the respondent and Timothy], the demeanor and credibility of the witnesses, the credibility of [the respondent's and Timothy's] testimony, and the evaluation of their testimony with all other testimony and documentary evidence according to the standards required by law. The court was able to clearly listen to and observe all of the witnesses and determine the validity, cohesion, and the credibility of their testimony. The court thoroughly reviewed the documentary evidence. On the basis of the clear and convincing evidence presented and for the reasons stated below, the court finds in favor of the petitions and hereby terminates the parental rights of the respondent . . . and . . . Timothy as to their children, Ariel and Denzel, for the reasons stated in detail [herein]."

Relevant to the adjudicatory phase of the termination proceeding,[8] the court concluded, by clear and convincing evidence, that the petitioner proved that the department had used reasonable efforts to locate the respondent and to reunify her with Denzel and Ariel prior to the filing of the petitions to terminate her parental rights.[9]

---

[8] "Under § 17a-112, a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase." (Internal quotation marks omitted.) *In re Niya B.*, 223 Conn. App. 471, 476 n.5, 308 A.3d 604, cert. denied, 348 Conn. 958, 310 A.3d 960 (2024); see also *In re Tresin J.*, 334 Conn. 314, 322–23, 222 A.3d 83 (2019).

[9] "Section 17-112 (j) (1) provides in relevant part that the Superior Court may grant a petition [for termination of parental rights] if it finds by clear and convincing evidence that . . . the [department] had made reasonable efforts to locate the parent and to reunify the child with the parent . . . *unless* the court finds . . . that the parent is unable or unwilling to benefit from reunification efforts . . . . In construing that statutory language, our Supreme Court has explained that [b]ecause the two clauses are separated by the word unless, this statute plainly is written in the conjunctive. Accordingly, the department must prove *either* that it has made reasonable efforts to reunify *or, alternatively,* that the parent is unwilling or unable to benefit from reunification efforts. . . . [E]ither showing is sufficient to satisfy this statutory element." (Emphasis in original; internal quotation marks omitted.) *In re Autumn O.*, 218 Conn. App. 424, 432, 292 A.3d 66, cert. denied, 346 Conn. 1025, 294 A.3d 1026 (2023).

It further determined that she had failed to achieve the degree of personal rehabilitation that would encourage the belief that, within a reasonable time considering the ages and needs of Denzel and Ariel, she could assume a responsible position in their lives. Specifically, the court stated: "While [the respondent] attended and engaged in her services, she has clearly failed to sufficiently benefit from the services and attain sufficient rehabilitation especially with regard to her long-standing domestic violence issues and ongoing voluntary relationship with [Timothy] which includes violations of the protective order. In addition, both [the respondent and Timothy] are clearly unwilling and unable to benefit from these reasonable efforts due to their failure to address their longstanding intimate partner violence issues which have placed Denzel and Ariel at risk. Significantly, they have not achieved sufficient insight as to their poor parenting skills and how their significant history of personal violence has negatively impacted the children. They have clearly put their own needs, and their clear intention to maintain a relationship with each other, over the safety, needs, and well-being of Denzel and Ariel."

In support of its conclusions, the court made the following relevant factual findings. The respondent's relationship with Timothy began in 2009, and they are the biological parents of four children. The respondent reported that domestic violence has occurred throughout the relationship and included both mental and physical abuse. She further acknowledged that the children have been exposed to intimate partner violence and that it likely has contributed to their behavioral issues; nonetheless, she stated that she and Timothy were "good parents."

Approximately eighteen months after the November 2, 2019 stabbing incident, the respondent "filed an amended police report regarding the domestic assault

incident wherein she changed her statement and stated that she had the knife in her possession prior to the assault. She also stated that she did not believe that [Timothy] intended to stab her or hurt her." Furthermore, the department learned that the respondent and Timothy were in contact with each other, in violation of the protective order. Timothy was arrested in October, 2020, for violating the protective order as a result of his contact with the respondent. "[The department] confirmed that [Timothy] called [the respondent] from his place of incarceration and they engaged in subterfuge to conceal their identities from prison staff. Telephone records from the prison confirmed that [the respondent] and [Timothy] were in contact with each other. They discussed the pending [department] case in addition to the domestic violence incident that led to [Timothy's] arrest in November, 2019, as well [as] plans on how [the respondent] was to bail out [Timothy]. They also discussed their ongoing commitment to one another. [The respondent] has consistently and repeatedly denied to [the department] that she has been in contact with [Timothy]."

Furthermore, both the respondent and Timothy were arrested on May 25, 2021, following a traffic stop in Hartford. Timothy was operating the respondent's motor vehicle, and she was a passenger. "[The respondent] denied her identity to the police at least several times during the stop and identified herself with her sister's name. [The respondent] was arrested for interfering and resisting as a result of this incident and a protective order was issued against [Timothy] with [the respondent] as the protected party. She falsely reported to the criminal court that she was not present in the vehicle which led to the charges being dropped. [The respondent] continued to lie about her presence in the car to [the department] and her service providers, as well as about her ongoing contact with [Timothy].

It was not until March, 2023, during her sworn testimony at the trial of this matter that [the respondent] admitted that she was in the car with [Timothy] on May 25, 2021. In addition, [the respondent] repeatedly denied having any contact with him or having a relationship with him since that time nor having any contact with him at his place of incarceration during 2019 to 2020, and most recently in July, 2022, when she was observed by family members with him in the community."

Pursuant to the court-ordered specific steps to facilitate the respondent's reunification with Denzel and Ariel, the department referred the respondent to a variety of services. During the period from 2018 to 2020, she struggled with attendance, but did make some progress and appeared engaged in the sessions she attended. Despite her reports to her provider to the contrary, she "was continuing to remain in contact with [Timothy] during his incarceration in violation of the full no contact protective order. She also continued to minimize the impact [that] the violence [in] their relationship with each other had on the children. In addition, [the respondent] has consistently told [the department] she wanted [Timothy] to be part of the children's lives."

From December, 2019, to July, 2020, the respondent participated in and successfully completed a domestic violence program. At the conclusion of the program, the provider determined that the respondent's ongoing risk was low to moderate but cautioned that her risk could increase to high if she engaged in contact with Timothy "prior to completion of her treatment recommendations and if she failed to demonstrate safe non-abusive behaviors for at least six months." The court observed: "[I]n violation of her specific steps, [the respondent] continued to remain in contact with [Timothy] while he was incarcerated and while attending the program." The respondent also participated in individual therapy starting in 2020. The department "was not

able to determine if her treatment properly addressed [her conduct with respect to the May 25, 2021 Hartford arrest], or her ongoing voluntary contact with [Timothy]" because the releases the respondent signed were limited in nature. The respondent began another domestic violence program in January, 2023, shortly before the termination of parental rights trial.

Following the removal of the children in 2019, the respondent was offered weekly in person and remote visitation via video chats. Because of issues that arose during these sessions, the department provided the respondent with suggestions on how to engage the children during the visits. "[Specifically, the respondent] relied on the use of electronics, including her cell phone, which negatively affected the children's behavioral needs and ability to maintain the children's behavior which often disrupted the visits. A notable concern was [the respondent] permitting Denzel to play a violent game on her phone . . . which depicted violence and blood from the use of a knife. The game is rated for children [thirteen] years of age and older. In addition, [the respondent] brought a 'fake' knife to a visit for Denzel. [The respondent] did not understand [the department's] concern in light of [Timothy's] knife attack on [the respondent] in 2019. [The respondent] minimized the content of the game and reported that Denzel had played the game since the age of three at their home. In addition, [the respondent] attempted to record the visits and interrogate the children at times regarding the foster parents which caused the children to feel conflicted and stressed. [The department] instructed [the respondent] not to bring her phone to the visits; however, she was observed using the phone on at least several occasions thereafter. Another concern was [the respondent] using her phone to allow her and the children to converse with [Timothy] via

FaceTime on the phone during the visits." The behaviors of Denzel and Ariel regressed before and after their supervised visits with the respondent, including acting out at school and having tantrums.

In August, 2020, the respondent continued to struggle with her use of electronics and the children's behavioral needs during the visits. She would still bring her phone to the visits despite being instructed not to, and she would deny having done so. During the supervised visits from September, 2020, to December, 2021, the respondent "appeared overwhelmed and unorganized . . . . She often struggled to assess the children's emotional needs and continued to struggle to recognize the impact of the trauma and removal on the children. She also struggled to incorporate the information she was provided during the sessions." Concerns remained regarding the respondent's missed sessions, inconsistency, and her difficulty in managing her work schedule and the children's appointments.

Ines M. Schroeder, a licensed clinical psychologist, conducted a court-ordered evaluation of the respondent, clinical interviews of the foster parents, developmental screenings of Denzel and Ariel, interactional evaluations between the respondent and the children, and interactional evaluations between the children and the foster parents. Schroeder contacted the respondent's service providers and reviewed the records provided by the court. In her evaluation, Schroeder noted that the respondent "was hampered by her inability to manage and process information well and react appropriately." Schroeder explained that the respondent "felt that she did not get the support she needed from [the department] and that they 'failed to help her' and expressed that '[t]hey are trying to break a family that wants to be a family. We have a great bond. It does not make sense to [terminate the parental relationship].' [Schroeder] opined that this was concerning as this

was an indication that [the respondent] was including [Timothy] in the 'family.' She further noted that [the respondent] had maintained a very long relationship with [Timothy] despite her claim that he was manipulative and hurtful, and that she was used to the cycle of abuse in her relationships and that cycle was repeated for her as an adult. She further opined that [the respondent] . . . 'does not believe that there are relationships without the violence [and] emotional harm embedded. . . . Sadly, [the respondent] failed [to] keep [the children] in a safe, consistent, stable environment due to the many changes where she lived, the intermittent violence in her relationship with their father, and inconsistency in care. . . . Even with services provided to [the respondent] about domestic violence and the impact to [the] children . . . she still indicated she was unsure how it affected them and felt that the behavioral issues were the only concern.' "

Next, the court stated that Schroeder had explained that, although the respondent had a general understanding of child development and expectations for independence, "she had limitations regarding her ability to understand their emotional and psychological needs as demonstrated by her allowing Denzel to play a violent video game which depicts intimate personal violence. She noted that this suggests [a] lack of insight on [the respondent's] part and that [t]his would be detrimental to the children to be in her care if she has a limited ability to grasp the psychological impact of the trauma to the children and ways to parent them effectively while providing emotional support. Significantly, [Schroeder] found that [the respondent] expressed that her children were treated well and [were] never in harm's way. She felt she kept them safe and minimized the incident when [Timothy] stabbed her with a knife despite her descriptions [suggesting] she was covered in blood and spoke to the children (with a knife sticking

out of her) and left them inside alone. She also noted that [the respondent] denied [that] the incident in November, 2019, was an intentional act to her but accidental in nature and that the potential for [Timothy] to receive [twelve] years [of incarceration] due to the charges seemed excessive. In addition, [the respondent] reported that she and [Timothy] were strong parents and that [Timothy] was a good parent because he was willing to watch the children when she went to work. [Schroeder] opined that [the respondent] failed to recognize the instability in her romantic relationship that led to the instability in the home for her children and this lack of insight would be detrimental to the children [being] in her care. [Schroeder] further opined that [the respondent] minimizes how the intimate personal violence minimized her strength as a parent and fails to understand how [Timothy's] actions can place her children at risk; she continues to struggle to understand how their cycle of violence over the years of their relationship created a chaotic and hostile environment that was unsafe for her children. She remains defensive in her posture and unable to successfully incorporate new information offered across programs. Notably, with regard to [the respondent's] relationship with [Timothy], [Schroeder] noted that [the respondent] denied any contact with [Timothy] since his release from prison and denied she was present . . . when they were arrested in [the respondent's] car in May, 2021." (Internal quotation marks omitted.)

The court found, by clear and convincing evidence, that the department had used reasonable efforts to locate the respondent and that it had made reasonable and ongoing efforts to reunify her with Denzel and Ariel prior to the filing of the petitions. See General Statutes § 17a-112 (j) (1). Next, it concluded that neither parent

had adequately or timely taken advantage of these services.[10]

The court then turned to the question of the failure to rehabilitate. See General Statutes § 17a-112 (j) (3) (B). It found that the petitioner had proved, by clear

[10] Specifically, the court explained: "While [the respondent] attended and engaged in her services, she has clearly failed to sufficiently benefit from the services and attain sufficient rehabilitation especially with regard to her long-standing domestic violence issues and ongoing voluntary relationship with [Timothy], which includes violations of the protective order. In addition, both [the respondent and Timothy] are clearly unwilling and unable to benefit from these reasonable efforts due to their failure to address their long-standing intimate partner violence issues which have placed Denzel and Ariel at risk. Significantly, they have not achieved sufficient insight as to their poor parenting skills and how their significant history of personal violence has negatively impacted the children. They have clearly put their own needs, and their clear intention to maintain a relationship with each other, over the safety, needs and well-being of Denzel and Ariel.

"As also discussed in detail [previously], [the respondent] was offered a multitude of services which included case management, family team meetings, counseling, exploration and assessment of family resources, parenting services, individual therapy, intimate personal violence program, supervised visitation, administrative case reviews, bus passes and transportation, foster care services, [c]onsidered [r]emoval [f]amily [t]eam [m]eetings and referrals for children's therapy and education services. While she has attended most of her supervised visits with the children, she struggled with maintaining their behavior and allowed the children to converse with [Timothy] on [the respondent's] cell phone even after being instructed not to bring her phone to the visits. This behavior during the visits clearly demonstrated her failure to sufficiently engage in or benefit from her services with regard to her intimate personal violence and parenting issues in a timely manner to the extent that her children can safely return to her care. . . . In addition, [the respondent] has consistently put her relationship with [Timothy] ahead of her children's needs. She has demonstrated a clear lack of insight as to the risk her ongoing and voluntary relationship with [Timothy] has on the children as well as to herself during the pendency of this matter. As such, she clearly has not demonstrated sufficient rehabilitation to the extent that she can safely care for . . . Denzel and Ariel within a reasonable period of time. . . .

"The court finds by clear and convincing evidence that [the department] made reasonable efforts to locate [the respondent] . . . and to reunify [her with Denzel and Ariel], and, further that [she is] unable or unwilling to benefit from the reunification efforts. The court further finds that services offered to [the respondent] . . . were appropriate, reasonable, and timely offered to assist them with reunification with Denzel and Ariel." (Citation omitted.)

and convincing evidence, that Denzel and Ariel had been adjudicated neglected on November 17, 2020, and committed to the care of the petitioner. It further found that the "clear and convincing evidence also clearly shows that [the respondent] has failed to make sufficient progress in her services and continues to be unable to sufficiently and timely benefit from these services to enable her to reunify with her children." This conclusion was based on the physical neglect of the children, the respondent's inability to meet the children's basic needs for supervision, the exposure of the children to intimate partner violence, and the respondent's mental health issues.

"The clear and convincing evidence also clearly shows that . . . [the respondent] has not demonstrated that she is able to provide her children with a safe, secure, and permanent home free from intimate personal violence at the present time nor into the foreseeable future. [The respondent] has also clearly demonstrated that she is unable and unwilling to benefit from reunification efforts as she has failed to sufficiently address her long-standing intimate partner violence issues which have placed the children at risk and caused them trauma. [The respondent] has consistently put her relationship with [Timothy] over and above the needs and well-being of Denzel and Ariel. It is clear to the court that she will continue to do so into the future. She was not forthcoming with her service providers as to her ongoing contact with [Timothy], including advising them of the [traffic stop] incident on May 25, 2021. The court is deeply troubled by [the respondent's] significant lack of insight as evidenced by her desire to maintain a relationship with [Timothy] and to keep him part of the 'family unit' which is further demonstrated by her ongoing willing violation of the court-ordered protective orders between them. Thus, she has clearly failed to benefit from the services in which she

has engaged and will be unable to do so in the foreseeable future." Ultimately, the court determined that the respondent was no closer to being able to safely parent these two children than she was at the time of their removal in November, 2019, and that the children "simply cannot wait for [the respondent] to rehabilitate."

In the dispositional phase of the proceedings, the court made findings as to each of the seven factors set forth in § 17a-112 (k). It concluded, by clear and convincing evidence, that the termination of the respondent's parental rights was in the children's best interests. Accordingly, the court rendered judgments terminating her parental rights and appointing the petitioner as the children's statutory parent for the purpose of securing their adoption as expeditiously as possible. This appeal followed. Additional facts will be set forth as necessary.

I

The respondent first claims that the court improperly shifted the burden of proof on the issue of personal rehabilitation to her. Specifically, she argues that the court placed the burden of proof on her as evidenced by the statement in its memorandum of decision that she "has not demonstrated that she is able to provide her children with a safe, secure, and permanent home free from intimate partner violence at the present time nor in the foreseeable future." The petitioner counters that, "[w]hen taken as a whole, the trial court's decision demonstrates that the court required the [petitioner] to prove that [the respondent] failed to rehabilitate." We agree with the petitioner that the court did not shift the burden of proof on the issue of personal rehabilitation to the respondent.

At the outset, we identify the applicable standard of review. "The question of whether a trial court has held a party to a less exacting standard of proof than the law

requires is a legal one. . . . Accordingly, our review is plenary. . . . Similarly, plenary review applies to a question of misallocation of a burden of proof. See . . . *Zabaneh* v. *Dan Beard Associates, LLC*, 105 Conn. App. 134, 140, 937 A.2d 706 (applying plenary review to plaintiff's claim that the [trial] court improperly required that it, rather than the defendant, bear the burden of proof regarding the existence of permission), cert. denied, 286 Conn. 916, 945 A.2d 979 (2008); *Wieselman* v. *Hoeniger*, 103 Conn. App. 591, 596–97, 930 A.2d 768 (applying plenary review to claim that although the court applied the clear and convincing standard of proof required to establish a fraudulent transfer, it did so to the wrong party), cert. denied, 284 Conn. 930, 934 A.2d 245 (2007). . . . Furthermore, if it is not otherwise clear from the record that an improper standard was applied, the appellant's claim will fail on the basis of inadequate support in the record." (Citations omitted; internal quotation marks omitted.) *In re Jason R.*, 306 Conn. 438, 452–53, 51 A.3d 334 (2012).

Additionally, "we are mindful that an opinion must be read as a whole, without particular portions read in isolation, to discern the parameters of its holding. . . . Furthermore, [w]e read an ambiguous trial court record so as to support, rather than contradict, its judgment." (Citation omitted; internal quotation marks omitted.) Id., 453; see also *Natasha B.* v. *Dept. of Children and Families*, 189 Conn. App. 398, 407, 207 A.3d 1101 (2019).

It is well established that the petitioner bore the burden of proving, by clear and convincing evidence, that the respondent had failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable amount of time, considering the ages and needs of Denzel and Ariel, she could assume a responsible position in their lives. See *In re Samantha C.*, 268 Conn. 614, 628–29, 847 A.2d 883 (2004); *In re Xavier H.*, 201 Conn. App. 81, 88, 240 A.3d

1087, cert. denied, 335 Conn. 981, 241 A.3d 705, and cert. denied, 335 Conn. 982, 241 A.3d 705 (2020). Simply stated, "[t]he burden of proof is always on the state when it seeks to remove children from the home." (Internal quotation marks omitted.) *In re J.R.*, 161 Conn. App. 563, 570, 127 A.3d 1155 (2015).

The following details, as set forth in the court's memorandum of decision, inform our resolution of the respondent's claim. At the outset, the trial court specifically stated that it had, inter alia, "carefully considered" the criteria set forth in the General Statutes and the applicable case law. This controlling authority placed the burden of proof on the petitioner. At the start of its discussion of the adjudicatory phase, the court expressly stated that "*the petitioner . . . is required to prove any one of the grounds alleged in the termination of parental rights petitions by clear and convincing evidence.*" (Emphasis added.) In support of this statement, the court cited to controlling case law and a rule of practice indicating that the burden of proving, by clear and convincing evidence, a statutory ground to terminate parental rights rested with the petitioner.[11] These citations provide support for the conclusion that the trial court was aware of and applied the proper burden in this matter. See, e.g., *In re J.R.*, supra, 161 Conn. App. 570. The court then repeated the petitioner's

---

[11] Specifically, the court cited to *In re Jacob M.*, 204 Conn. App. 763, 777, 255 A.3d 918 (in adjudicatory phase, trial court determines whether one of statutory grounds for termination of parental rights exists by clear and convincing evidence), cert. denied, 337 Conn. 909, 253 A.3d 43, and cert. denied, 337 Conn. 909, 253 A.3d 44 (2021), *In re Melody L.*, 290 Conn. 131, 148–49, 962 A.2d 81 (2009) (in order to terminate parental rights, petitioner required to prove, inter alia, by clear and convincing evidence that one of seven grounds for termination set forth in § 17a-112 (j) (3) exists), overruled on other grounds by *State* v. *Elson*, 311 Conn. 726, 754–55, 91 A.3d 862 (2014), and Practice Book § 35a-3 (when coterminous petitions are filed, judicial authority must determine whether statutory grounds exist to terminate parental rights by clear and convincing evidence).

burden of proof and specifically noted that it was obligated to strictly comply with the statutory criteria for the termination of parental rights.

The court also observed that the petitioner was required to prove by clear and convincing evidence that the department had used reasonable efforts to locate the respondent and that it made reasonable and ongoing efforts with respect to reunification prior to filing the termination petitions. This further evidenced the court's awareness of the proper allocation of the burden of proof and demonstrated that it applied the correct standard in the present case.

As to the issue of the failure to rehabilitate, the court found that the evidence "clearly and convincingly proves . . . [that, as] of the conclusion of the trial of this matter,[12] [neither the respondent nor Timothy has] achieved the requisite degree of personal rehabilitation that would encourage the belief that within a reasonable period of time, considering Denzel's and Ariel's ages and needs, [the respondent and Timothy] could assume a responsible position in the children's lives, as required by . . . § 17a-112 [(j)] (3) (B)." (Footnote added.) It then stated: "[*The respondent*] *has not demonstrated that she is able to provide her children with a safe, secure, and permanent home free from intimate personal violence at the present time nor into the foreseeable future.*" (Emphasis added.) Ultimately, the court concluded that the petitioner "has met [her] burden of proof as to this ground by clear and convincing evidence, that [the department] made reasonable efforts to locate and reunify [the respondent and Timothy] with

[12] In its memorandum of decision, the trial court observed that it "may properly rely upon events occurring after the date of the petition when considering whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." See, e.g., *In re Damian G.*, 178 Conn. App. 220, 238–39, 174 A.3d 232 (2017), cert. denied, 328 Conn. 902, 177 A.3d 563 (2018).

Denzel and Ariel, and that [the respondent and Timothy] have been unable to benefit from reunification efforts.''

On appeal, the respondent contends that the court's statement that she had failed to demonstrate her ability to provide her children with a safe, secure, and permanent home free from intimate personal violence at the present time or in the foreseeable future, indicates that the court improperly shifted the burden of proof from the petitioner to her. Specifically, she contends that the "directness of the trial court's language" coupled with other sections of the memorandum of decision establish the improper burden shifting and warrant a reversal of the court's judgment. We are not persuaded.

The respondent, as the appellant in this matter, bears the burden of establishing that the court applied an incorrect legal standard, and we will not engage in speculation or presume such error. *In re Paulo T.*, 213 Conn. App. 858, 876, 279 A.3d 766 (2022), aff'd, 347 Conn. 311, 297 A.3d 194 (2023). Our appellate courts have recognized that a court's misstatement regarding the correct legal standard does not require a reversal and new proceeding in every instance. Id. Furthermore, we iterate that "an opinion must be read as a whole, without particular portions read in isolation, to discern the parameters of its holding. . . . [W]e read an ambiguous trial court record so as to support, rather than contradict, its judgment." (Citation omitted; internal quotation marks omitted.) *In re Jason R.*, supra, 306 Conn. 453.

In reviewing the memorandum of decision as a whole, we conclude that the court applied the proper burden of proof and required the petitioner to prove, by clear and convincing evidence, that the respondent had failed to achieve a sufficient degree of personal rehabilitation.[13] The court expressly stated that it had considered

___

[13] We note that, at the outset of the trial, the court orally advised the respondent and Timothy: "Because the [petitioner] filed the termination of parental rights petitions and is asking the court to permanently sever your legal relationship with your children, it is up to the [petitioner] to prove

carefully, inter alia, the criteria set forth in the General Statutes, and the applicable case law in granting the petitions to terminate parental rights on the basis of clear and convincing evidence. The court repeatedly referred to the petitioner's burden of establishing the requirements for termination by clear and convincing evidence, as well as the applicable case law detailing the controlling precedent. For example, the memorandum of decision states: "The court is next called upon to determine whether [the petitioner] has met [her] burden of proving the allegations presented in the pending termination of parental rights petitions . . . . Pursuant to § 17a-112 et seq., during the adjudicatory phase of a [termination of parental rights] proceeding, the petitioner . . . is required to prove any one of the grounds alleged in the termination of parental rights petitions by clear and convincing evidence." To this end, the court also observed that the department made reasonable efforts to reunite the respondent and the children and that, although she attended and engaged in such services, "she has clearly failed to sufficiently benefit from the services and attain sufficient rehabilitation especially with regard to her long-standing domestic violence issues and ongoing voluntary relationship with [Timothy], which includes violations of the protective order. . . . Significantly, they have not achieved sufficient insight as to their poor parenting skills and how their significant history of personal violence has negatively impacted the children. They have clearly put their own needs, and their clear intentions to maintain a relationship with each other, over the safety, needs and well-being of Denzel and Ariel."

Further, the petitioner offered testimony from department social workers, a psychologist, and police officers regarding the instances of intimate personal violence,

[her] case at this termination of parental rights trial by clear and convincing evidence."

the respondent's efforts to continue and conceal her relationship with Timothy, even after he had stabbed her, her inability to maintain control and meet the emotional needs of the children during visits, and her failure to comply with requests to not bring her cell phone and allow Denzel to play inappropriate video games during visits. On the basis of the evidence presented by the petitioner, the court concluded that she had met her burden with respect to the issue of the respondent's failure to rehabilitate. See *In re Jason R.*, supra, 306 Conn. 453–55.

Reading the court's decision as a whole, we conclude that it did not shift the burden of proving personal rehabilitation to the respondent. See *In re Fayth C.*, 220 Conn. App. 315, 325, 297 A.3d 601 (court's analysis of party's failure to achieve sufficient personal rehabilitation, combined with citations to correct legal standard, evinces use of correct legal standard), cert. denied, 347 Conn. 907, 298 A.3d 275 (2023). After our careful review of the record, we are satisfied that, despite the court's isolated use of the imprecise language that forms the basis for the respondent's claim, the court applied the proper standard. The challenged language reflects the trial court's rejection of the respondent's evidence of personal rehabilitation after it had determined that the petitioner had met her burden with respect to this issue. See *In re Jason R.*, supra, 306 Conn. 455. The respondent's claim, therefore, fails.

II

The respondent next claims that the court improperly determined that she failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable period of time, considering the ages and needs of the children, she could assume a responsible position in the children's lives. Specifically, she argues that the last evidence of violence between

her and Timothy occurred in 2019, and the department "had no hard evidence of contact between [Timothy and the respondent] after 2021" and, therefore, the evidence was insufficient to conclude that she had failed to achieve personal rehabilitation at the time of the trial in February, 2023. We are not persuaded by the respondent's sufficiency claim.

We begin our analysis by setting forth the relevant legal principles and our standard of review. With respect to the former, "[p]ersonal rehabilitation as used in [§ 17a-112 (j) (3) (B) (i)] refers to the restoration of a parent to [her] former constructive and useful role as a parent. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue. . . . An inquiry regarding personal rehabilitation requires us to obtain a historical perspective of the respondent's child-caring and parenting abilities. . . . Although the standard is not full rehabilitation, the parent must show more than any rehabilitation. . . . Successful completion of the petitioner's expressly articulated expectations is not sufficient to defeat the petitioner's claim that the parent has not achieved sufficient rehabilitation. . . . [E]ven if a parent has made successful strides in [her] ability to manage [her] life and may have achieved a level of stability within [her] limitations, such improvements, although commendable, are not dispositive on the issue of whether, within a reasonable period of time, [she] could assume a responsible position in the life of [her] children." (Citations omitted; internal quotation marks omitted.) *In re Fayth C.*, supra, 220 Conn. App. 319; see also *In re Shane M.*, 318 Conn. 569, 585–86, 122 A.3d 1247 (2015); *In re Serenity W.*, 220 Conn. App. 380, 396–97, 298 A.3d 276, cert. denied, 348 Conn. 902, 300 A.3d 1166 (2023).

Next, we set forth the applicable standard of review. "As clarified by our Supreme Court in *In re Shane M.*, [supra, 318 Conn. 587–88], the standard of review of a trial court's determination that a parent has failed to achieve sufficient rehabilitation is as follows: We have historically reviewed for clear error both the trial court's subordinate factual findings and its determination that a parent has failed to rehabilitate. . . . While we remain convinced that clear error review is appropriate for the trial court's subordinate factual findings, we now recognize that the trial court's ultimate conclusion of whether a parent has failed to rehabilitate involves a different exercise by the trial court. A conclusion of failure to rehabilitate is drawn from both the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in . . . § 17a-112 (j) (3) (B). Accordingly, we now believe that the appropriate standard of review is one of evidentiary sufficiency, that is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court." (Internal quotation marks omitted.) *In re Lil'Patrick T.*, 216 Conn. App. 240, 245–46, 284 A.3d 999, cert. denied, 345 Conn. 962, 285 A.3d 387 (2022); see also *In re Kyreese L.*, 220 Conn. App. 705, 720, 299 A.3d 296 (although reviewing courts apply evidentiary sufficiency standard of review to trial court's ultimate determination on question of whether parent has failed to rehabilitate sufficiently, clear error review applies to court's subordinate factual findings), cert. denied, 348 Conn. 901, 300 A.3d 1166 (2023); *In re Kylie P.*, 218

Conn. App. 85, 108, 291 A.3d 158 (same), cert. denied, 346 Conn. 926, 295 A.3d 419 (2023).[14]

Furthermore, "[i]t is not the function of this court to sit as the [fact finder] when we review the sufficiency of the evidence . . . rather, we must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the [judgment of the trial court] . . . . In making this determination, [t]he evidence must be given the most favorable construction in support of the [judgment] of which it is reasonably capable. . . . In other words, [i]f the [trial court] could reasonably have reached its conclusion, the [judgment] must stand, even if this court disagrees with it." (Internal quotation marks omitted.) *In re Caiden B.*, 220 Conn. App. 326, 362–63, 297 A.3d 1025, cert. denied, 348 Conn. 904, 301 A.3d 527 (2023).

In the present case, the court found that the department's involvement with this family commenced in 2012 and included fourteen referrals regarding physical neglect of the children, an inability to meet their basic needs for supervision, and exposure to intimate partner violence and mental health issues. As previously noted,

[14] As we noted in *In re Kyreese L.*, supra, 220 Conn. App. 720 n.8, "[p]rior to *In re Shane M.*, supra, 318 Conn. 569, courts had applied the clear error standard of review both to a trial court's determination that a parent failed to rehabilitate and to that court's subordinate factual findings." In her appellate brief, the respondent argues that, "[f]or a variety of reasons, the respondent asserts that the standard of review as established by our Supreme Court in *In re Shane M.*, should be replaced by the former clear error standard. . . . The respondent is aware, however, that this court is not capable of overturning Supreme Court precedent. This challenge is raised for the purpose of review upon the grant of a petition for certification should it be necessary. The respondent presents her argument to this court under the sufficiency standard articulated by our Supreme Court." (Citation omitted.) It is axiomatic that this court, as an intermediate body, is bound by the precedent from our Supreme Court and is unable to modify it. *In re Kyreese L.*, supra, 720 n.8; see also *In re Niya B.*, 223 Conn. App. 471, 490 n.19, 308 A.3d 604, cert. denied, 348 Conn. 958, 310 A.3d 960 (2024); *In re Lil'Patrick T.*, supra, 216 Conn. App. 246 n.4.

the department's "most recent involvement with this family began in November, 2019, with the primary concerns of ongoing intimate partner violence . . . and the children's continuous exposure to the violence, resulting in their physical and emotional neglect, in addition to the children's exposure to [Timothy's] ongoing substance abuse issues while in a caretaking role for the children." The respondent reported that domestic violence issues occurred throughout her relationship with Timothy, which began in 2009. "She also reported that the police were called frequently to their home and multiple protective orders were issued by the court with [the respondent] as the protected person." Despite this history, however, the respondent described herself and Timothy as "good parents."

We emphasize that Denzel and Ariel were present in the home at the time of the November, 2019 stabbing of the respondent by Timothy, which resulted in wounds to the respondent's face, neck, and chest area. Although the children did not witness the physical attack, the respondent checked on the children while the knife was imbedded in her chest. At that time, the respondent reported that Timothy, in possession of a knife, intentionally had stabbed her. Timothy was arrested and a full no contact order was issued. In March, 2021, however, the respondent filed an amended police report in which she changed her statement, claiming that she had the knife prior to the assault, and Timothy had not intended to stab or hurt her.

Additional violations of the protective order followed. The respondent and Timothy communicated by telephone during his incarceration, and their discussions involved the pending department case, the November, 2019 stabbing, the respondent's plans to "bail out" Timothy, and "their ongoing commitment to

each other." Despite phone records of these communications, the respondent "has consistently and repeatedly denied to [the department] that she has been in contact with [Timothy]." On May 25, 2021, the police stopped a motor vehicle driven by Timothy with the respondent in the passenger seat. The respondent attempted to deceive the police officers as to her identity, and repeated this falsehood to the criminal court, the department, and her service providers. Family members observed the respondent with Timothy in July, 2022, in violation of the protective order. Despite her participation in various programs and individual therapy,[15] the evidence supports the court's conclusions that she continued her relationship with Timothy, despite the negative effects on the children and in violation of the specific steps, and that she consistently has indicated to the department that "she wanted [him] to be part of the children's lives." She also has made multiple attempts to conceal this relationship.

Furthermore, the court found that the respondent relied on electronic devices, including her cell phone, during visits with the children, which negatively impacted their behavior. She also brought a "fake" knife to a visit, and allowed Denzel, to play a violent video game depicting blood from the use of a knife. Despite directions to not bring the phone to her in person visits with the children, the respondent did so on several occasions and used it to FaceTime with Timothy, again violating the protective order.

Schroeder, who conducted the evaluations, expressed concern that the respondent was including Timothy as a member of the family based on her beliefs that the

---

[15] We emphasize that "it is well settled that [a] determination with respect to rehabilitation is not solely dependent on a parent's technical compliance with specific steps but rather on the broader issue of whether the factors that led to the initial commitment have been corrected." (Internal quotation marks omitted.) *In re Blake P.*, 222 Conn. App. 693, 708, 306 A.3d 1130 (2023).

department had failed to provide support and help her, and that it was attempting to break up the family. "She further noted that [the respondent] had maintained a very long relationship with [Timothy] despite her claim that he was manipulative and hurtful, and that she was used to the cycle of abuse in her relationships . . . ." Schroeder further opined that the respondent remained "unsure" as to how this violence affected the children. Schroeder also noted that the respondent minimized the November, 2019 stabbing, despite the fact that she was "covered in blood and spoke to the children (with a knife sticking out of her) . . . ." The respondent denied that the assault was intentional and questioned the necessity for Timothy to receive a period of incarceration of twelve years. Schroeder indicated that the respondent's failure to recognize the instability of her relationship with Timothy would be detrimental to Denzel and Ariel. Finally, the November, 2022 addendum to the termination of parental rights social study stated that "family members have seen [the respondent and Timothy] both out together in the community, most recently as [July, 2022]."

On the basis of this evidence, the court found, by clear and convincing evidence, that the petitioner proved that the respondent had not achieved the requisite degree of personal rehabilitation that would encourage the belief that, within a reasonable period of time, considering the ages and needs of Denzel and Ariel, she could assume a responsible position in their lives. The court focused on the intimate partner violence issue, as well as the issue of the respondent placing her relationship with Timothy over the needs and well-being of Denzel and Ariel, and concluded that she will continue do to so in the future. It also noted her ongoing lack of recognition of the negative aspects of her relationship with Timothy.

We conclude that sufficient evidence existed in the record to support the court's determination of failure

to rehabilitate. The respondent's continuing efforts to maintain her relationship with Timothy despite the significant history of intimate partner violence, coupled with her efforts to conceal this relationship from the department, her providers, and the police, support the court's conclusion that she has failed to address these issues that placed the children at risk of trauma, and that she will continue to do so in the future. A failure to acknowledge and address the underlying personal issue that formed the basis for the department's concerns indicates a failure to achieve a sufficient degree of rehabilitation. See *In re Angelina S.*, 223 Conn. App. 52, 67, 306 A.3d 1185 (2023), cert. denied, 348 Conn. 950, 308 A.3d 549 (2024); see also *In re A'vion A.*, 217 Conn. App. 330, 352, 288 A.3d 231 (2023).

We are not persuaded by the respondent's argument that the court's conclusion was improper because the last evidence of intimate partner violence occurred in 2019, the last evidence of contact between the respondent and Timothy was in 2021, and the psychological report was based on the conditions as they existed in December, 2021. The evidence reflects that the domestic violence issues have existed consistently throughout this relationship, which began in 2009, and that the respondent has continued to prioritize and maintain her relationship with Timothy, despite its negative effects on Denzel and Ariel. Further, the evidence reflects that she actively has attempted to conceal the relationship from the department and others. Finally, we note that the record contains evidence, which the court was free to credit, that the respondent and Timothy were seen together in the community in July, 2022. This evidence and the reasonable inferences drawn therefrom support the court's conclusion that the respondent has failed to rehabilitate. See *In re Nevaeh G.-M.*, 217 Conn. App. 854, 878–80, 290 A.3d 867 (evidence that respondent was incapable of, or chose to ignore safety plans and

protective orders, repeatedly mislead department and others about her continued relationship with individual who had committed acts of intimate partner violence, and despite awareness of potential physical and psychological harm to children that might result from their presence during incident of intimate partner violence, respondent repeatedly failed to take reasonable steps to minimize risk of exposure to additional acts of intimate partner violence, supported conclusion that respondent had failed to rehabilitate), cert. denied, 346 Conn. 925, 295 A.3d 418 (2023); see also *In re Blake P.*, 222 Conn. App. 693, 709–710, 306 A.3d 1130 (2023) (despite ending relationship, respondent's failure to understand or gain insight as to how intimate partner violence issues impacted her role as mother and, notwithstanding her participation in certain programs, coupled with pattern of intimate partner violence relationships, supported court's conclusion that petitioner had demonstrated by clear and convincing evidence respondent could not exercise judgment necessary to keep child safe and healthy).

For these reasons, we conclude that the respondent cannot prevail on her claim that the court's determination that she failed to rehabilitate was not supported by the evidence.

The judgments are affirmed.

In this opinion the other judges concurred.